James **KLEIN**, Plaintiff,

v.

Edward **VANEK**, Defendant.

No. 96 C 5834.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 31, 2000.

---

814

Thomas M. Peters, Kevin R. Peters, Chicago, IL, for Plaintiff.

Francis W. Petro, Deborah Marie Petro, Petro & Petro, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

KENNELLY, District Judge.

In this action under 42 U.S.C. § 1983, plaintiff James Klein claims that he was wrongfully beaten by Edward Vanek, a Chicago police officer, on July 9, 1995. The Court previously denied Vanek's motion for summary judgment. *Klein v. Vanek*, No. 96 C 5834, 1999 WL 966968 (N.D.Ill. Oct. 5, 1999). The case is set for trial on January 31, 2000. At the final pretrial conference on January 27, 2000, the Court heard argument on Klein's motion *in limine* and made oral rulings. The purpose of this Memorandum Opinion is to make a record of the basis for the Court's rulings.

## BACKGROUND

On the evening of July 9, 1995, two Chicago police officers, Vincent Krocka and Steven Composto, picked Klein up after Sue Vanek, the wife of defendant Vanek, also a Chicago police officer, called the police to report that Klein had been stalking her. Specifically, she claimed that Klein had shown up outside her office and had made a threatening gesture. There had been prior incidents between Klein and Sue Vanek, which at one point had led to criminal charges resulting in a guilty plea to a misdemeanor. However, Klein was not arrested or charged on the night of July 9. Instead, Krocka and Composto questioned him for approximately a half hour and then drove him to a parking lot near the intersection of Touhy and Lehigh, which was a few blocks from where he was staying. Klein says that the officers told him to get out of the car; the officers claim that this is where Klein asked to be let out. Just after Klein got out of the squad car, he was approached by a man whom he identified as Vanek. Vanek hit him repeatedly with a golf club while another man, whom Klein could not see, hit him from behind. Klein says that after they finished beating him, the men drove away in a Cadillac. Another witness also saw the beating and the Cadillac but could not identify Klein's assailants. Within a day, Klein had made a complaint against Vanek, Krocka, and Composto to the Chicago Police Department's Office of Professional Standards, which began an investigation on July 11. A few days later, Sue Vanek pressed charges against Klein. He eventually pled guilty to a misdemeanor assault charge.

About one year later, Klein filed this lawsuit against Edward Vanek, Sue Vanek, Krocka, and Composto under 42 U.S.C. § 1983, seeking compensation for the injuries he had suffered in the beating. Krocka and Composto settled with Klein, agreeing

to pay him $35,000 in return for dismissal of Klein's claims against them. We granted summary judgment in favor of Sue Vanek, leaving Klein's claim against Edward Vanek as the only claim remaining for trial.

## DISCUSSION

### A. Testimony concerning "stalking" incidents

Klein has moved to bar Sue Vanek from testifying at trial, claiming that she has nothing to say that is relevant to the issues in this case. Defendant Vanek wants to call Sue to testify about the events of July 9 that preceded the assault on Klein and also about her prior encounters with Klein. We have already discussed the events of July 9. As for the prior encounters, Sue Vanek believed Klein was stalking her. There was a history of encounters that had begun two or three years before the July 1995 incident. Klein had come to Sue's realty office and made inquiries about properties that he may actually have had no interest in buying, and they had encountered each other at a shoe store near her office. Sue claimed that following these encounters, Klein had called her repeatedly and had left notes on her car when she did not respond. In 1994, Klein came to an open house Sue was sponsoring and supposedly threatened her with a poker. This led to a criminal charge and to a guilty plea by Klein to a misdemeanor charge.

Sue Vanek's testimony about the events of July 9 prior to the beating of Klein is relevant and admissible. The testimony is helps to establish the time frame in which the events of July 9 occurred and provides evidence of Edward Vanek's whereabouts on that evening. The testimony is highly probative concerning Vanek's claim that he was not, and could not have been, at the parking lot at the time of the beating, and that he could not have conspired with Krocka and Composto. The only part of Sue Vanek's testimony regarding these events that has the potential for being unfairly prejudicial to Klein is her rendition of seeing Klein outside her office making a threatening gesture. However, it does not appear that Sue Vanek's testimony about what she saw will be seriously disputed; Klein's counsel informed the Court at the pretrial conference that Klein will concede that he was outside the office and shook his fist at Sue. Any potential for *unfair* prejudice is outweighed by the fact that the testimony helps to explain why Krocka and Composto picked Klein up in the first place; without this testimony there would be a risk that the jury might erroneously believe that Klein was simply selected at random. We will, however, preclude Sue Vanek from testifying concerning her emotional reaction to seeing Klein; such testimony is not relevant and any marginal probative value that it may have would be far outweighed by the unfair prejudice to Klein if such testimony were admitted. In addition, Sue's testimony about the events *following* the beating—in particular, her later encounter with Krocka and Composto at the police station, when they explained to her why they had not arrested Klein—are not relevant and are excluded from evidence.

The history of Klein's prior encounters with Sue Vanek, assuming defendant's characterization is accurate, certainly would be frightening to any reasonable person; assuming Klein again showed up outside her office on July 9 and made a threatening gesture, she had ample reason to call the police, Krocka and Composto had a proper basis to pick him up for questioning, and there was a legal basis for Sue Vanek's later charge against Klein. But the trial in this case does not involve the propriety of Klein's arrest or charge. Rather, the claims relate exclusively to the beating Klein received. It is no defense to this claim that Klein may have, in some sort of vigilante-like way, gotten what he had coming to him. And indeed that is not Vanek's defense in the lawsuit: his contention is that he is not the person who beat Klein.

Vanek does not contend (nor could he) that the "stalking" evidence should be admitted to show Klein's bad character or as somehow mitigating the wrongfulness of the assault. Rather, he argues that Sue's testimony about her prior encounters with Klein is relevant "to explain why [Klein] falsely identified [Edward Vanek] as one of his alleged attackers. [Klein] had stalked Sue Vanek for three years prior to July 9, 1995 and was familiar with Ed Vanek whom [sic] he perceived as an obstacle to the object of his obsession, Sue Vanek." Defendant's Response to Plaintiff's Motion in Limine, p. 3. However, Vanek has offered no support for the proposition that Klein "perceived [defendant] as an obstacle" to Sue Vanek. Based on the proffer made by Vanek's attorney at the pretrial conference, it appears that Klein had encountered Edward Vanek just one time prior to July 9. When Klein was arrested on Sue's complaint in 1994, Edward Vanek came to the police station, approached Klein and told him to stay away from his (then) wife.

 Though not characterized as such by Vanek, he is essentially articulating a theory that Klein harbored a bias against him, or against him and Sue, which led Klein to falsely identify Ed Vanek as his assailant. The Court believes that Vanek is entitled to develop this theory to some extent, but not to the extent he wishes. In order to establish a basis for the bias claim, Vanek may elicit from Sue Vanek and from Klein testimony about their encounter on July 9 (within the limits discussed above), as well as the fact that she had accused Klein of stalking her in 1994. Vanek himself may testify about his previous encounter with Klein—when he supposedly told Klein to stay away from his wife—and may also elicit testimony about this from Klein. Beyond this, the Court will exclude testimony about Sue Vanek's prior encounters with Klein. The details

of those encounters are not probative of the theory argued by Klein—that he perceived Ed Vanek as an "obstacle" between him and Sue Vanek, thus causing him to falsely identify Vanek as his attacker. And even if these details were somehow probative, their probative value is marginal at best and is far outweighed by the risk of unfair prejudice to Klein: if the details of these encounters were admitted in evidence, it is likely that despite any cautionary instructions the jury would become so inflamed and prejudiced against Klein that they would be unable to fairly determine the issues in this lawsuit.

## B. Testimony of Dr. Anthony D'Agostino

Klein has moved to bar the testimony of Dr. Anthony D'Agostino, a psychiatrist. Dr. D'Agostino reviewed records concerning psychiatric treatment of Klein as well as Klein's deposition. He did not personally examine Klein.[1] According to Vanek's response to the motion in limine, D'Agostino would testify that Klein suffers from bipolar disorder—otherwise known as manic-depressive disorder—and from a mixed personality disorder with narcissistic and paranoid features. Klein has been prescribed medications to treat his bipolar disorder, including lithium, stelazine, and depakote.

Vanek indicates that D'Agostino would testify that people suffering from a mixed personality disorder of the type Klein purportedly has tend to blame others when things go wrong and believe that the world owes them a living (this is a paraphrase of D'Agostino's deposition testimony); when they fail at something they "lie to explain [their] failures." D'Agostino also thinks that Klein may well believe some of the lies he tells. Vanek indicates that D'Agostino would also testify that a person with manic depressive disorder can become vio-

---

1. Prior to the time that this case was assigned to this Court's calendar, defendant sought permission to conduct a psychiatric examination of Klein, but the request was denied by Magistrate Judge Morton Denlow in an oral ruling the grounds for which are not disclosed in the record and which neither party has discussed in addressing plaintiff's motion in limine.

lent if his advances are resisted and that a person with a personality disorder of this type could misperceive another person's views of their relationship with each other. Vanek argues that D'Agostino's testimony is relevant to show that Klein's personality disorder could cause him to falsely blame Vanek for his injuries, falsely believe that others were conspiring against him, and lie about the events surrounding the attack.

■ *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), provides the framework for evaluating the admissibility of purported expert testimony.. The trial judge must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. This involves an assessment of whether the reasoning underlying the testimony is scientifically valid and whether it properly can be applied to the facts in issue. *Id.* at 592–93, 113 S.Ct. 2786. Among the factors the court is to consider are whether the theory or technique relied upon by the expert can be and has been tested; whether it has been subjected to peer review or scrutiny within the scientific community; and whether it is reliable, including (where applicable) the potential rate of error and the general acceptance it enjoys within the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786. The court must also consider other applicable provisions of the Federal Rules of Evidence, including Rules 703 (concerning the type of information upon which experts may rely) and 403 (concerning unfair prejudice and other similar factors).

■ Expert testimony bearing on a party's or witness's truthfulness is not *per se* inadmissible. In *United States v. Benson*, 941 F.2d 598 (7th Cir.1991), the Seventh Circuit stated that "[c]redibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *Id.*

at 604. But in *United States v. Hall,* 93 F.3d 1337 (7th Cir.1996), the court, while not overruling *Benson,* held that testimony that a criminal defendant suffered from a psychiatric disorder that causes people to make false confessions and was susceptible to interrogation techniques that would lead him to make unreliable statements was admissible under Rule 702. *Id.* at 1345. The court in *Hall* also discussed approvingly the First Circuit's decision in *United States v. Shay,* 57 F.3d 126 (1st Cir.1995), in which the court reversed a jury verdict, finding erroneous the trial judge's exclusion of expert testimony that the defendant suffered from an extreme form of "pathological lying," which the defendant had offered to explain that his statement of responsibility for the offense was not reliable. *Hall,* 93 F.3d at 1343–44.

The court in *Hall* read *Benson* as barring the testimony of· the purported expert, an IRS agent, on the grounds that he "offered no special knowledge or skill that would be particularly helpful" in determining whether a person (in *Benson,* the defendant) was telling the truth. *Hall,* 93 F.3d at 1343. While reaffirming this limitation, the court distinguished *Benson* by concluding that in *Hall,* the expert did in fact have specialized knowledge that would be helpful·to the jury. *Id.* at 1344–45.

■ *Hall* cannot fairly be read as giving parties free rein to introduce psychiatric evaluations of witness credibility. This Court believes that it would undermine public confidence in our legal system and seriously·diminish the quality of justice were *Hall* read to allow trials to degenerate into swearing contests between opposing psychiatrists claiming to have insight into whether a particular person is telling the truth. A court must carefully evaluate testimony of this type to ensure that it is truly based in science and does not simply tell jurors nothing more than what they already know as a matter of common sense and everyday experience. However, if a party·or witness·has a psychiatric condition that competent psychiatric testimony

*and* established and peer-reviewed research indicates does have a bearing upon his or her truth-telling ability in some relevant way, *Hall* and *Daubert* tell us that such testimony may be admissible under Rule 702, subject to the limitations imposed by Rule 403 and the other rules of evidence.

██ In this case the Court is not called upon to determine the outside contours of these principles, for Vanek has failed to show that Dr. D'Agostino's claims are scientifically valid or that his testimony would be relevant or helpful to the jury. On the issue of scientific validity, Vanek has done nothing to support the admissibility of D'Agostino's testimony other than to tender the transcript of his deposition. Specifically, Vanek has provided no support from medical or scientific literature for the proposition that having bipolar disorder or personality disorder with narcissistic and paranoid features makes a person more likely to fabricate, nor did D'Agostino himself testify at his deposition that any such support exists. Indeed, when asked direct questions on this score, D'Agostino essentially disavowed that he was making such a claim. After Klein's counsel set forth a hypothetical regarding Klein's version of the attack, he asked D'Agostino if he could say to a reasonable degree of medical certainty that Klein's report was false. He replied that "As a psychiatrist viewing his records and things, I could not say that it was true or false." D'Agostino Dep. 75. And when Vanek's counsel directly asked D'Agostino whether "narcissistic persons tend to fabricate," he replied that "[i]t's not a primary feature of the disorder." *Id.* 79. He opined that Klein "probably actively lies *about certain things,*" *id.* 79–80 (emphasis added), but in elaborating on this statement he said "I think [Klein] lies *to explain his failures*" and *"to give reasons for why things aren't happening the way they should,"* in other words, in order to shift blame to others for his own failings. *Id.* 80 (emphasis added). D'Agostino said there was "no way" he would be able to tell whether Klein was lying or

telling the truth about a particular matter. *Id.* 81–82.

Without more than this, the Court cannot conclude that D'Agostino's testimony meets *Daubert's* threshold requirement of scientific validity. And our review of D'Agostino's deposition (which we again emphasize is the only material that Vanek provided to the Court) has exposed an even more significant problem with his testimony: it is not relevant to the issues in this case. *Daubert's* second factor—whether the testimony will assist the trier of fact—is essentially a relevance inquiry. *See Hall,* 93 F.3d at 1342; *Porter v. Whitehall Laboratories Inc.,* 9 F.3d 607, 613 (7th Cir.1993). As the court stated in *Hall,* "[a]n expert's credentials and methodology may be impeccable, but if the proffered testimony fails the general test of relevance under Rule 402, or if, in the words of Rule 702 it is not likely to 'assist the trier of fact to understand the evidence or to determine a fact in issue,' then the district court should reject the proffer." *Hall,* 93 F.3d at 1342.

██ D'Agostino's testimony would not illuminate the issues in this case in any way helpful to the jury. Vanek has done nothing to link Klein's identification of Vanek as his assailant with his supposed propensity to falsely "explain his own failures" by blaming others and to misrepresent his own skills and merits. Nothing in D'Agostino's testimony indicates that Klein is in any way prone to make false identifications or that he would be likely to falsely blame Vanek for beating him up. Based upon the material submitted by Vanek, Dr. D'Agostino simply is not in a position to offer an opinion regarding Klein's character for truthfulness, *see* Fed.R.Evid. 608(a), in any way that is pertinent to the issues in this trial.

In short, there is no support for a claim that Klein's alleged psychiatric conditions make him more likely than the ordinary person to lie in any way pertinent to the issues in this case. The Court will not permit Dr. D'Agostino to testify to the

matters about which he testified in his deposition because his testimony lacks scientific support and because it would not be helpful to the jury on any matter in issue. In addition, D'Agostino's testimony would be enormously and unfairly prejudicial to Klein in that it would focus the jury on the details of Klein's psychiatric condition, which has no bearing on the case at all, but which could unfairly cause the jury to be biased against him due to his psychiatric diagnosis. Thus based upon *Daubert* and Rules 702 and 403, the Court grants Klein's motion *in limine* with regard to Dr. D'Agostino and bars his testimony at trial.

### C. Conclusions of OPS Investigator

Klein has also moved to exclude the report of Andrew Palahniuk, a Chicago police officer assigned to investigate for the Chicago Police Department's Office of Professional Standards (OPS). Klein was beaten on July 9, 1995; he submitted a complaint against Vanek, Krocka, and Composto to OPS on July 10. Palahniuk was assigned to investigate the complaint and met with Klein on July 11. Klein provided some information to Palahniuk on that date, but he declined to provide a detailed statement until after speaking with counsel. Shortly after this, Klein learned that he had been charged with stalking Sue Vanek; on advice of counsel, he declined to cooperate further with Palahniuk. As a result, Palahniuk was never able to conduct a complete and coherent interview of Klein.

Based on Palahniuk's reports, which were the only material submitted by Vanek in opposition to Klein's motion, it appears that he did not actually interview officers Krocka and Composto but rather simply considered written statements they submitted. Palahniuk also received information from Vanek, but it is not clear whether this was an interview or a written report; there is no memorandum of interview, in contrast to the memorandum Palahniuk prepared after his interview of Klein. Palahniuk does appear to have interviewed Sue Vanek and a co-worker of hers, as well as other officers peripherally involved in one way or another.

Palahniuk's conclusion was to "recommend[ ] that this case be closed with a finding of UNFOUNDED." It is clear from the "conclusion" paragraph of his report that he based this on an assessment of Klein's credibility. In concluding that "many of the statements made by [Klein] are suspect," Palahniuk relied on a vague statement (without any supporting detail or analysis) that Klein had "some history of mental problems" as well as the claim that he had previously stalked Sue Vanek, and he also cited the fact that "Klein failed to cooperate with the investigation."

Each party may call Palahniuk to testify about the opposing party's statements to him. Each party likewise may call Palahniuk where necessary to impeach witnesses who testify inconsistently with their statements to him. Palahniuk may also properly testify regarding any matters that he observed firsthand in the course of his investigation. None of these points are disputed. What the Court is called upon to determine is the admissibility of Palahniuk's conclusion that Klein's complaint was unfounded and his reasons for reaching that conclusion.

Though Palahniuk's conclusions are hearsay under Federal Rule of Evidence 801(c), Rule 803(8)(C) provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law" are admissible, "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). The fact that Palahniuk's "unfounded" finding is an opinion or conclusion on his part does not make that finding inadmissible; the Supreme Court has held that portions of investigatory reports containing opinions and conclusions are admissible under Rule 803(8)(C) so long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthi-

ness requirement. *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). If a public officer's finding meets the Rule's threshold requirement that it be a factual finding resulting from an investigation made pursuant to authority granted by law—as is the case here—the burden is on the party opposing admission to show that the finding lacks trustworthiness. *See, e.g., Miller v. Field,* 35 F.3d 1088, 1090 (6th Cir.1994). In evaluating whether the sources of information or other circumstances indicate lack of trustworthiness, the Court examines, among other factors, the timeliness of the investigation, the special skill or experience of the official, whether a hearing was held, and possible motivational problems. *Id.; see also* Fed.R.Evid. 803, 1972 Advisory Committee Notes.

Klein focuses on the latter factor, arguing that "unfounded" findings by Chicago Police Department OPS investigators involving complaints against Chicago Police Officers *necessarily* lack trustworthiness. Though Klein rightly expresses concern regarding the impartiality of an investigator employed by the same police department that employed Vanek, Krocka, and Composto, there is no bright-line rule that in-house investigatory reports are inadmissible absent specific evidence of bias, *see Perrin v. Anderson,* 784 F.2d 1040, 1047 (10th Cir.1986),[2] and Klein has provided the Court with no statistics or other evidence to support the creation of such a rule for OPS reports.

The Court nonetheless concludes that Klein has met his burden of showing that the circumstances surrounding Palahniuk's investigation and conclusions indicate a lack of trustworthiness. This is not the same as a finding that Palahniuk was wrong. The Court's views of the credibility of the conclusion are irrelevant; the focus is on the reliability of the process used to reach the conclusion. *See Moss v.*

*Ole South Real Estate, Inc.,* 933 F.2d 1300, 1306–07 (5th Cir.1991). Specifically, a court must determine "whether the report was prepared or compiled in a way that indicates that its conclusions can be relied upon . . . ." *Id.*

Palahniuk's investigation was timely, but his conclusion amounts to a judgment regarding the relative credibility of Klein (whom he did not interview completely) and Vanek, Krocka, and Composto (whom he evidently did not interview at all). There is no indication that Palahniuk has any specialized expertise in judging credibility. *See Matthews v. Ashland Chemical, Inc.,* 770 F.2d 1303, 1310 (5th Cir.1985) (expertise of official who made report is important consideration under Rule 803(8)(C). Nor can he claim any special skill in determining the impact of Klein's alleged mental illness on his credibility; as discussed earlier, even Dr. D'Agostino, a trained psychiatrist, could give no real guidance on the effect of this factor. OPS held no hearings; indeed the investigator who made the credibility determination did not even have the benefit of in-person statements from the people whose credibility he judged. For these reasons, the Court concludes that Klein has met his burden of showing that Palahniuk's conclusions are not trustworthy.

Even were the Court to conclude that Palahniuk's report was admissible under Rule 803(8)(C), we would exclude the report under Federal Rule of Evidence 403. Palahniuk's conclusion involves the core issue in the case, the same issue that the jury will have to resolve: is Klein's account credible? *Cf. Tulloss v. Near North Montessori School, Inc.,* 776 F.2d 150, 154 (7th Cir.1985) (upholding exclusion of investigative report whose conclusion essentially duplicated issue for determination at trial). Yet Palahniuk reached his conclusion based on incomplete evidence, made

---

2. In *Perrin,* the admission of an investigative report prepared by the police department that employed the defendant was held not to have been an abuse of discretion. In that case, in contrast to the present one, the report was prepared by several high-ranking officers after all of the participants were interviewed and hearings were held.

determinations of relative credibility without actually interviewing the officers face to face, and relied on an unsupported assumption that Klein's history of mental treatment—which Palahniuk does not appear to have actually reviewed, and which he did not ask any medical professionals to evaluate—somehow demonstrated or supported his lack of credibility. Were the Court to admit Palahniuk's report, the trial would be sidetracked into a dispute over the adequacy of the investigative procedures used by Palahniuk, and we would run headlong into evidence (including Klein's mental history and the details of his earlier encounters with Sue Vanek) that the Court has concluded is inadmissible. For all of these reasons, the Court concludes that whatever slight probative value Palahniuk's conclusions may have is far outweighed by the danger of unfair prejudice and confusion of the issues, and that the conclusions thus would be inadmissible under Federal Rule of Evidence 403 even if they were admissible under Rule 803(8)(C). *See Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995) (concern that focus of trial would shift to issues of adequacy of investigation is proper basis to exclude investigative report); *Moss,* 933 F.2d at 1310 (relying in part on failure to interview key witness in upholding exclusion of report).

## CONCLUSION

Plaintiff's motion *in limine* is granted in part and denied in part as stated in this Memorandum Opinion and Order.